1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    WILBERT NOBLE,                          Case No. 06-cv-07114-EMC

8                    Petitioner,

9           v.                              **ORDER DENYING PETITIONER'S**
                                            **PETITION FOR WRIT OF HABEAS**
10   DARREL G. ADAMS, et al.,                **CORPUS**

11                   Respondents.           Docket No. 1

12

13

14                      **I.       INTRODUCTION**

15          Petitioner Wilbert Noble is a state prisoner serving 130 years to life in state prison.  He

16   filed a petition for a writ of habeas corpus under 28 U.S.C. section 2254.  Docket No. 1 ("Pet.").

17   Following a remand from the Ninth Circuit, and with the leave from this Court, Mr. Noble

18   supplemented his petition with additional claims.  Docket No. 66 ("Supp. Pet.").  Mr. Noble

19   thereafter filed motions requesting the following:  (1) oral argument; (2) conditional discovery; (3)

20   an evidentiary hearing; and/or (4) record expansion.  *See* Docket Nos. 94, 95.  Respondent Warden

21   Stuart Sherman[1] has responded to all Mr. Noble's requests on the merits.

22          For the reasons discussed below, this Court rules as follows:

23          • Mr. Noble's request for oral argument is **DENIED**;

24          • Mr. Noble's request for conditional discovery is **DENIED**;

25          • Mr. Noble's request for an evidentiary hearing is **DENIED**;

26          • Mr. Noble's request for record expansion is **DENIED**; and

27

28   _____
     [1] Mr. Sherman substituted in place of Darrel G. Adams as his successor.  *See* Docket No. 82.

- Mr. Noble's petition for writ of habeas corpus is **DENIED**.

## II.      BACKGROUND

A.      Procedural Background

On June 28, 2005, Mr. Noble filed his state court *pro se* petition for a writ of habeas corpus in Santa Clara superior court.  Docket No. 16-3, Ex. 3.  On July 21, 2005, the superior court denied relief.  Docket No. 16-5 (superior court order).  The Court of Appeal and the California Supreme Court both summarily denied his habeas appeal.  Docket No. 16-11; Docket No. 16-14

Thereafter, on November 16, 2006, Mr. Noble sought collateral review in federal court. *See* Pet.  The *pro se* petition raises the following claims for relief:  (1) ineffective assistance of appellate counsel; (2) prosecution knowingly used false testimony; (3) newly-raised evidence demonstrates his innocence; (4) insufficient evidence to support conviction; (5) violation of Confrontation Clause; (6) expert testimony on Childhood Sexual Abuse Accommodation Syndrome ("CSAAS") was improper; (7) *Brady* violation; (8) admission of Mr. Noble's prior convictions violated due process and equal protection; (9) ineffective assistance of trial counsel; and (10) cumulative error.

On December 18, 2007, Respondent moved to dismiss the petition as untimely.  Docket No. 16.  The district judge previously assigned to this petition granted that motion and dismissed the action as untimely on August 12, 2008.  Docket No. 18.  On April 20, 2012, the Ninth Circuit reversed and remanded to the district court to determine whether, under California law, Mr. Noble's delay in filing his habeas petition was reasonable.  Docket No. 31.  Mr. Noble subsequently was appointed habeas counsel and filed his brief addressing the timeliness question on April 10, 2015.  Docket No. 36.  However, on June 15, 2015, Respondent filed an answer to the petition on the merits and waived the issue of timeliness.  Docket No. 40.

On December 4, 2015, Mr. Noble moved to stay the federal proceedings in order to exhaust further claims in state court.  Docket No. 51.  The district court granted the motion to stay on March 23, 2016.  Docket No. 57.  Thereafter, on April 22, 2016, Mr. Noble filed with the

United States District Court
Northern District of California

2

California Court of Appeal a motion to recall the remittitur[2] or, in the alternative, petition for writ of habeas corpus to exhaust two claims that the newly-appointed habeas counsel identified during review of the record. Docket No. 65-3, Ex. A. The Court of Appeal denied the request, as did the California Supreme Court, thereby exhausting state remedies on Mr. Noble's two additional claims.

On April 27, 2018, after exhausting his supplemental claims in state court, Mr. Noble moved to lift the stay in order to file a supplemental habeas petition containing his additional claims. Docket No. 77. Following a reassignment of the matter, this Court lifted the stay and permitted Mr. Noble to amend his petition. Docket No. 80. Mr. Noble's supplemental habeas petition (which was concurrently filed with his motion to lift the stay on April 27, 2018) alleges a due process violation based on an amendment to the charging document before trial and ineffective assistance of appellate counsel. Docket No. 66. Respondent thereafter filed its supplemental answer to the new claims on February 27, 2019. Docket No. 85.

On July 8, 2019, Mr. Noble filed his traverse, which voluntarily dismissed claims one through four and claim eight from the original *pro se* petition. Docket No. 92. This left the following claims for habeas relief pending before this Court: (1) violation of Confrontation Clause; (2) improper expert testimony on CSAAS; (3) *Brady* violation; (4) ineffective assistance of trial counsel; (5) cumulative error; (6) due process violation regarding variance; and (7) ineffective assistance of appellate counsel. On July 22, 2019, Mr. Noble filed two motions requesting oral argument, conditional discovery, an evidentiary hearing, and/or record expansion. Docket Nos. 94, 95. Respondent objected to these requests and responded to new arguments raised in Mr. Noble's traverse. Docket No. 99.

B.      State Court Exhaustion

On June 28, 2005, Mr. Noble mailed his *pro se* petition for a writ of habeas corpus in state court. Docket No. 16-3, Ex. 3. On July 21, 2005, the superior court concluded that Mr. Noble's

---

[2] California Rules of Court rule 8.272(c)(2) allows, for good cause, an appellate court to recall the remittitur on its own or at a party's motion, thereby reinvesting jurisdiction over the case in the appellate court.

United States District Court
Northern District of California

petition failed to state a *prima facie* case for habeas relief and denied relief because the petition was only supported by self-serving declarations.  Docket No. 16-5 (superior court order).  The court emphasized that "[f]or an issue to be properly presented in the [] petitions[,] there is the requirement that a full *prima facie* case for relief exist."  *Id*.  It then found that Mr. Noble had "not provided any evidence aside from his own opinion to support his allegations of misconduct or ineffective assistance."  *Id*.  The Court of Appeal and the California Supreme Court both denied his habeas appeal in a single sentence.  Docket No. 16-11 ("The petition for writ of habeas corpus is denied."); Docket No. 16-14 ("Petition for writ of habeas corpus is DENIED.").  Thus, the superior court's denial of Mr. Noble's habeas petition is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991)

As to Mr. Noble's two supplemental claims that he sought to recall the remittitur or habeas relief alternatively, they were also summarily denied by the California appellate courts in one sentence.  Docket No. 65-3, Exs. C, H.

C.     Factual Background

The factual background pertaining to this petition was succinctly stated in the decision from the California Court of Appeal:

> In 2002, 13-year-old John Doe[3] alternated living with his paternal grandmother and mother during his sixth-grade school year. Defendant was married to John's grandmother.  John had known him since he was seven years old.  John began playing football in July 2002.  The football season continued into the school year.  All of the acts of molestation occurred at the grandmother's apartment on Camden Ave in San Jose.
>
> One day after football practice, John walked towards the kitchen of his grandmother's house.  Defendant was sitting in a chair near the entrance to the kitchen.  As John walked by the chair, defendant pinched John's "butt."  Defendant asked John, "where are you going to be when you go back out?"  John felt uncomfortable and embarrassed and thought he "would get in trouble" if he told anyone.
>
> On another occasion, John came into the house after riding his bike. As John walked through the living room to go to his bedroom, defendant pinched John's "butt."  John went to his room, grabbed his helmet because he was going to play football, and went outside.

---

[3] To preserve the victim's anonymity we will refer to him as John Doe or John.

United States District Court
Northern District of California

John felt uncomfortable and scared.  John did not tell anyone about the incident since he thought he "was going to get in trouble because [he] was supposed to tell somebody a long time ago before it happened."

One weekend day, John was sitting on the couch watching the movie "Good Burger."  He was wearing shorts and a T-shirt.  Defendant came out of his room and walked towards John.  Defendant bent down and grabbed John's penis over his clothes for a "[c]ouple [of] seconds."  John felt uncomfortable and scared that defendant might do it again.  John went to his room, grabbed his clothes, and went outside.

On a different weekend day, John got out of the shower.  He had forgotten his towel in his bedroom.  He picked up his clothes and pulled the cord to his radio from the wall.  When John opened the bathroom door, he saw defendant bent over with his "butt" exposed.  Defendant grabbed John's arms at the wrist and pulled John towards him.  John tried to pull away, but was unable so to do because defendant was too strong.  As defendant pulled John toward him the "top" of John's penis went into "the hole" in defendant's "butt" for about 20 seconds.  John thought that defendant was trying to have sex with him.  John kicked defendant in the leg and hit him on the back.  Defendant released John.

On a weekday during football season, John was in his bedroom getting ready for football practice.  Defendant entered John's room and pushed John onto the bed.  John fell over backward onto the bed and hit his head against the wall.  Defendant pushed both of John's hands above John's head. Defendant put his mouth on John's penis for "some seconds."  John tried to push up with his hands, but defendant was too strong.  Defendant got up and left the room without saying anything.

On another occasion when John was getting ready for football practice, defendant came into the room and pushed John onto the bed.  John fell and his face hit the bed.  Defendant got on John's back while he was holding John's bicep area.  John tried to get up by doing "a push-up but [he] couldn't" because defendant "weighed too much."  John's grandmother came into the room, told defendant to get off John, hit defendant a few times, and told him to pack his things and get out.  John's grandmother was upset and told John not to tell anyone about what had happened.

On January 14, 2002, a social worker interviewed John.  John told her that nothing had happened.[4]  Both John's mother and his grandmother accompanied John to the interview.[5]  Defendant waited in the car.

Subsequently, John told his mother that defendant had touched him.

---

[4] At trial, John claimed that he had done so because his grandmother had told him before the interview not to say anything.

[5] John was interviewed alone.

She called the police.  Detective Heather Randol interviewed John at the Children's Interview Center.  Randol arranged for John and his mother to make a pretext phone call to defendant.

The pretext phone call was taped.  The transcript of the tape was entered into evidence at trial and the tape was played for the jury.  During the call, defendant stated that he was "sorry about what had happened, the way it happened."  John's mother asked defendant why John's grandmother had "to punch [him] that day when [he was] laying on [John's] butt."  Defendant replied, "We were playing (inaudible), okay."  John's mother asked defendant if he did "anything else besides put [his] mouth on [John's] penis."  Defendant responded, "No, uh-huh.  Absolutely not."  John spoke to defendant.  Defendant said to him, "You know, I'm sorry for (inaudible)."

Before trial, the defense filed a motion in limine seeking exclusion of CSAAS evidence.  Defense counsel contended that CSAAS evidence should be excluded on Evidence Code section 352 grounds and because it does not meet the requirements of the Kelly-Frye/Daubert test.[6]  Counsel argued that the proposed evidence was unnecessary in this case since the expert was only being called "basically to say that there can be inconsistencies and that sometimes children don't report [molestation] right away."  The court ruled that CSAAS was beyond the normal experience of the jury and that it would allow the evidence.

Following John's testimony at trial, the prosecution introduced into evidence, over defense objection, the abstract of judgment from two cases.[7]  In one case defendant was convicted of lewd and lascivious acts on a niece, who was 10 years old at the time.  In the other case, defendant was convicted of oral copulation by force on an 18-year-old male, who was in defendant's care.[8]  The jury was instructed with CALJIC No. 2.50.1 as follows:  "Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in this case.  If you find that the defendant committed a prior sexual offense you may, but you are not required to infer that the defendant had a disposition to commit sexual offenses.  If you find that the defendant had this disposition you may but you are not required to infer that he was likely to commit and did commit the crimes of which he is accused.  However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes.  The weight and significance of the

---

[6] *People v. Kelly*, 17 Cal. 3d 24 (1976); *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[7] Before trial, pursuant to Evidence Code section 1108, the prosecution sought to introduce evidence of two sexual offenses committed by defendant. Defendant objected to the admission. The trial court ruled that the prior convictions were admissible, but decided that the evidence should be presented through the admission of the abstract of judgment for the prior convictions.

[8] The first incident occurred in July 1987. The second incident occurred in November 1992.

United States District Court
Northern District of California

evidence, if any, are for you to decide."

Subsequently, the People called investigator Carl Lewis to testify. Before he testified, the court admonished the jury with CALJIC No. 10.64 as follows:  "Mr. Lewis will testify about Child Sexual Abuse Accommodation Syndrome.  This evidence is not received and must not be considered by you as proof of the alleged victim's molestation-excuse me-this evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true.

"Child Sexual Abuse Accommodation research is based upon an approach that is completely different from that which you must take to this case.  The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience as distinguished from that research approach.  You are to assume that the defendant is innocent.

"The People have the burden of proving guilt beyond a reasonable doubt.  You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing if it does that the alleged victim's reactions as demonstrated by the evidence are not inconsistent with him having been molested."

Lewis stated that he was a criminal investigator employed by the Santa Clara County District Attorney's office.  Primarily, he was assigned to follow up child abuse case investigations.  Beginning in 1984, he worked for the Alameda County Sheriff's Department and for the police departments in Redwood City, Los Gatos and Half Moon Bay.

In 1984, Lewis received 24 hours of training in investigating crimes against children, "primarily sexual abuse against children for first responders."  In 1992, he attended a 40-hour training course for newly assigned investigators of sexual assault.  From that point on, he has built upon his training and experience and now has "probably 500 or more hours of classroom and seminar training primarily in child sexual abuse investigation and aspects of child sexual abuse."  Lewis testified that he had personally investigated 300 to 400 cases of child sexual abuse.  In addition to belonging to several professional organizations relating to prosecution of child sexual abuse, he was the acting coordinator of the Children's Interview Center in Santa Clara County.  In 1995, he began teaching classes on child interviewing techniques to experienced police officers, psychologists, deputy district attorneys, and mental health workers.  In addition to possessing an Associate in Science degree in the administration of justice, Lewis testified that he was enrolled as a senior at San Jose State University.  Lewis testified that he had qualified as an expert in CSAAS about 85 times in the "former Municipal and Superior Courts of Santa Clara County, Superior Court of Solano County, Superior Court of Monterey County, and in the United States Federal District Court in San Jose."

Lewis stated that he had not conducted any investigations in this case.  Nor had he interviewed witnesses or read any reports or

transcripts.  On voir dire, defense counsel established that Lewis was not a medical doctor and did not have a doctoral degree, master's degree or bachelor's degree in any field.  He was not a therapist, nor had he treated or counseled anyone for a psychological syndrome.

Over defense objection, the trial court accepted Lewis as an expert witness in CSAAS and the common reactions and traits of sexually abused children.

Lewis described CSAAS as "a concept" that seeks to "put a common language or terminology into some of [the] behaviors or conditions that come up commonly in cases of child sexual abuse and to offer an alternative explanation for them."

Lewis explained that CSAAS came from the work of Dr. Roland Summit, who operated a number of child sexual abuse treatment centers in Southern California.  CSAAS consists of five categories of behaviors.  The five categories are: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; and (5) retraction.  Not all five categories of behavior are present in every case of child sexual abuse. Lewis detailed the five categories of CSAAS.  "Secrecy describes the fact that the sexual abuse of the child almost invariably occurs when the offender is alone with the child, alone or isolated."  "The fact that it's done in those circumstances, that is only when the offender is alone with the child, can convey to the child's sense that this is a secret, bad taboo in some way.  And then the offender can do things subtly and not so subtly to reinforce with the child that that's a secret not to share with anyone."

Helplessness refers to the fact that "[n]o child is ever able to resist the sexual advances of an adult particularly a known or trusted adult."  Furthermore, "[u]nlike an adult crime victim who we might expect to immediately call 911 and give a full and complete description to the police of the attacker and fully cooperate with the prosecution, a child might let out information over time and not be able to make a full and complete description.  Part of the reasons for that can be threats, promises, the child's own internal struggles, maybe the child has a perception of the offender's relationship with a non-offending caretaker, may not want to upset the child, may not tell right away because he or she may feel they might get in trouble and children aren't too likely to tell on themselves."

The entrapment and accommodation category describes how "[w]hen the child is enduring ongoing sexual abuse or even the burden of carrying the secret from a one time incident . . . he or she is trapped.  And being trapped in that situation they have to find a way to get by from day to day; that is, they have to accommodate. They have to allow it to go on. [¶] Accommodate can also describe how a child can accommodate, put up with or allow the sexual abuse to continue."  "Depending on what the circumstances are, whether it's a family or a classroom or a scout troop or a church, whatever the community that the child is in happens to be-the child often doesn't want to upset that.  And they may have a sense that if he or she says something or tries to stop the abuse then it may have

greater impact than just whatever is that he or she is going to say."

The fourth category—delayed, conflicted, and unconvincing disclosure—"has three parts." With regard to delay, "most sexual abuse is never disclosed during childhood." When it is disclosed in childhood, "[i]t's not uncommon at all for there to be a delay. Sometimes a significant delay between the last incident or the beginning of the abuse until the time that it's reported." A child's statements about abuse may be conflicting: "[A] child might say something at one point and at a later point in the investigation process might say something that is not exactly the same as what he or she said the first time." Disclosure is often the result of a triggering mechanism such as an argument or discipline. "[A] child might come back with, well, the reason I came home drunk or the reason I came home late or something like that is because he's been molesting me. And when the child says that under the circumstances it's usually seen as an attempt to shift blame for the child. The child is trying to get out of the hot seat. He's trying to blame somebody else for something."

Lastly, with respect to retraction, disclosure of sexual abuse can set off a series of events including the child's removal from the household and family pressure. The child may believe that "the way to fix that can be to say, well, I just made it up."

In addition, Lewis testified that "the research shows that a child is more than three times as likely to be molested by someone he or she has a relationship with." Further, the term "grooming" refers to actions taken by molesters to lower a child victim's inhibitions over time. Such acts might include paying particular attention to the child by taking him or her on special trips, doing special things for them or giving them gifts or rewards.

**The Defense Case**

The defense offered two stipulations. First, that John spoke to social worker Rebecca Menusah on January 14, 2002. Second, defendant and his wife vacated the Camden Avenue apartment on March 10, 2002.

The jury retired to deliberate on the afternoon of January 31, 2003. Deliberations resumed on Monday February 3, 2003. By 4 p.m. on that day the jury had reached a verdict.

*People v. Noble*, 2004 WL 248984, at *1–6 (Cal. Ct. App. Feb. 11, 2004) (footnotes in original).

The jury found Mr. Noble guilty of one count of aggravated sexual assault (forcible oral copulation) of a child under fourteen; three counts of lewd act on a child under fourteen; and false imprisonment. *Id.* at 1. Mr. Noble was acquitted of aggravated sexual assault (sodomy) on a child under fourteen. *Id.* On March 26, 2003, the trial court sentenced Mr. Noble to an indeterminate term of 120 years to life in state prison consecutive to ten years. *Id.*

9

### III.   LEGAL STANDARD

The Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended Section 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst*, 501 U.S. at 803–04. "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Id*. at 803.

1

## IV.   DISCUSSION

A.   Request for Oral Argument, Leave to Propound Discovery, And An Evidentiary Hearing Or, Alternatively, for Record Expansion

Mr. Noble requests oral argument pursuant to Habeas Local Rule 2254-8(a).  Specifically, Mr. Noble seeks to address the following at oral argument:  (1) Sixth Amendment claim; (2) ineffective assistance of appellate counsel claim; (3) Confrontation Clause claim; (4) cumulative prejudice claim; and (5) any other substantive or procedural issues this Court deems useful.  Under Habeas Local Rule 2254-8(b), this Court has discretion to set oral argument "[w]ithin 30 days after an evidentiary hearing or within 30 days after the Court has denied a request for an evidentiary hearing . . . ."  Habeas L.R. 2254-8(b).  Respondent does not expressly object to Mr. Noble's request for oral argument.

Mr. Noble also seeks conditional discovery for his *Brady* claim and his ineffective assistance of counsel claim.  These two claims are based on Mr. Noble's argument that the prosecution played an edited—and, thus, incomplete—version of a telephone call between the victim's mother and Mr. Noble at trial.  According to Mr. Noble, the full, unedited version contained exculpatory evidence.  Specifically, Mr. Noble requests this Court to "order respondent (including the relevant prosecutors and law enforcement agencies) to produce the original pretext call recording, so that Noble may submit it for examination by an expert."  Docket No. 94 (emphasis in original).  Mr. Noble, however, presents no evidence that a full version of the call exists, much less contains exculpatory evidence other than his own uncorroborated declaration.

Mr. Noble also requests an evidentiary hearing for his *Brady* claim, his ineffective assistance of counsel claim, and his claim for improper admission of CSAAS testimony.  Alternatively, he requests an opportunity to expand the record on these claims.  Respondent argues that Mr. Noble's Confrontation Clause claim related to the pretext phone call is procedurally defaulted because it was raised for the first time in the state habeas petition—*i.e.*, Mr. Noble failed to raise this argument on direct appeal.  Docket No. 99.

As explained in greater detail below, because there is no merit to the claims for which Mr. Noble seeks an evidentiary hearing, discovery, or record expansion, the Court **DENIES** these

United States District Court
Northern District of California

1   requests.  While Respondent does not oppose Mr. Noble's request for oral argument, this Court

2   finds that oral argument is not warranted because Mr. Noble has not demonstrated a *prima facie*

3   case for habeas relief.

4   B.   <u>Request for Writ of Habeas Corpus</u>

5        Mr. Noble's *pro se* petition and supplemental petition seek numerous grounds for habeas

6   relief.  As indicated above, Mr. Noble voluntarily dismissed claims one through four and claim

7   eight from his *pro se* petition.  The Court addresses each remaining claim below.

8        1.   <u>Violation of Confrontation Clause (Claim Five)</u>

9        At trial, the prosecution played a recorded telephone call between Mr. Noble and the

10  victim's mother, Allison Richard.  Docket No. 41-2 ("RT") at 208–09.  Mr. Noble's trial counsel

11  did not object to the prosecution playing the recording to the jury.  *Id*. at 208.  But because Ms.

12  Richard did not testify at trial, Mr. Noble now claims that the prosecution's presentation of the

13  recorded call violated his right to confront the witness.  Pet. at 56.  Mr. Noble contends that the

14  recording occurred "at the police station for the production of testimony with sights set for trial."

15  *Id*.

16       Respondent argues that Ms. Richard's statements on the call were not testimonial under

17  *Crawford v. Washington*, 541 U.S. 36 (2004).  Docket No. 40-1 ("Answer") at 18.  Specifically,

18  Respondent contends Ms. Richard's statements were not testimonial because she did not make the

19  statements to law enforcement, and her statements were not offered for their truth, *i.e.*, they were

20  made to give context to Mr. Noble's statements.  *Id*.  Even if the statements were testimonial,

21  Respondent argues that the constitutional error was not prejudicial.  *Id*. at 19.  Lastly, in its

22  supplemental answer, Respondent argues that this claim was procedurally defaulted in state court,

23  which thereby precludes federal habeas review.  Respondent did not raise this procedural-default

24  argument until after it filed its initial answer; Ninth Circuit precedent did not recognize the

25  procedural bar from federal habeas review at the time the initial answer was filed.

26       Respondent's procedural-default argument has merit.  Mr. Noble did not raise his

27  Confrontation Clause argument on direct appeal.  Instead, the argument appeared for the first time

28  in Mr. Noble's habeas petition in superior court.  The state trial court denied the petition as

procedurally defaulted because it "could have been brought on direct appeal." Docket No. 16-5 (superior court order) (citing *In re Dixon*, 41 Cal. 2d 56 (1953); *In re Harris*, 5 Cal. 4th 813 (1993)). The Supreme Court recently upheld California's *Dixon* procedural bar to be an adequate ground on which to preclude federal habeas review. *Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016). The Supreme Court upheld the procedural bar because it is regularly followed in California and similar rules continue to be applied by other state courts across the country: "[t]he general rule in federal habeas cases is that a defendant who fails to raise a claim on direct appeal is barred from raising the claim on collateral review." *Id.* at 1805 (quoting *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006)).

In Mr. Noble's traverse, he underscores that Respondent's answer to his *pro se* habeas petition herein abstained from arguing that Claim 5 is procedurally barred. But Respondent's failure to raise the procedural-bar argument in its initial answer is excusable because at the time of Respondent's initial answer in 2015, the law in the Ninth Circuit was that the *Dixon* bar did not preclude federal habeas review. *See Lee v. Jacquez,* 788 F.3d 1124 (9th Cir. 2015), *rev'd sub nom. Johnson v. Lee*, 136 S. Ct. 1802 (2016). Accordingly, Respondent's argument is therefore properly before this Court.

To avoid the procedural bar, Mr. Noble argues that the state court's denial of his petition was ambiguous as to whether it applied to the Confrontation Clause claim. Docket No. 92 ("Traverse") at 31. While it is true that the denial was short (*i.e.*, two pages), the decision clearly laid out which claims were before the court, and it concluded that "several of petitioner's claims were or could have been brought on direct appeal. Therefore, they are not properly raised in the present petition." Docket No. 16-5. Mr. Noble contends that the state court's use of the word "several" was ambiguous because it does not list the claims that the court deemed to be procedurally barred. But the context of the superior court's decision is clear. The court had the benefit of a record before it, which included the Court of Appeal decision resulting from Mr. Noble's direct appeal in which he only raised two issues—*e.g.*, admission of CSAAS evidence and admission of prior sex offenses as improper character evidence. *Noble*, 2004 WL 248984, at *1. The most reasonable reading, thus, is that the superior court concluded any newly-raised, record-

based claim other than the two claims brought on direct appeal were procedurally barred.  Other than Mr. Noble's Confrontation Clause and insufficiency of the evidence arguments, the remaining claims were rejected on the merits by the state court.  Docket No. 16-4 ("As for petitioner's remaining claims, petition has failed to raise a *prima facie* case for relief.").

The Ninth Circuit case on which Mr. Noble relies, *Calderon v. U.S. Dist. Court for E. Dist. of California*, 96 F.3d 1126, 1131 (9th Cir. 1996), is of no help.  In *Calderon*, the court found that the California Supreme Court's denial of thirty-nine claims that were procedurally barred because "they were or could have been but were not raised on appeal or were waived by failure to preserve them at trial" was ambiguous.  *Id*. at 1128.  However, the ambiguity did not stem from the fact that the state court failed to itemize which claims it denied; instead, the confusion was whether the state court denied it under the *Dixon* rule or under the *Waltreus* rule[9] because both were at issue. *Id*. at 1131 ("We need not resolve the[*Dixon*] issue here, however, since the California Supreme Court's order provides no basis upon which to apply the *Dixon* rule, if adequate, to Bean's claims. The order, which we agree with the district court is ambiguous, does not specify which of Bean's thirty-nine claims the court rejected under *Waltreus*, and which it rejected under *Harris /Dixon*.").

Here, there is no competing procedural-bar theory on which the state court relied—it was only the *Dixon* rule.  *Cf. Valerio v. Crawford*, 306 F.3d 742, 774 (9th Cir. 2002) (en banc) (finding the lack of distinguishing between *Dixon* and *Waltreus* when barring habeas relief rendered the denial ambiguous).   Accordingly, this Court will not consider Mr. Noble's Confrontation Clause claim because it is procedurally barred from federal habeas review under *Dixon*.[10]

2.     Expert Testimony on CSAAS (Claim Six)

At trial, the judge overruled Mr. Noble's motion *in limine* and permitted the prosecution to

---

[9] "California's *Waltreus* rule provides that 'any issue that was actually raised and rejected on appeal cannot be renewed in a petition for a writ of habeas corpus.'"  *Calderon*, 96 F.3d at 1131 (quoting *In re Waltreus*, 62 Cal.2d 218, *cert. denied*, 382 U.S. 853 (1965)).

[10] Even if it did, the Court has grave doubts about the merits of this claim given the statements by Ms. Richard on the call appear to have been admitted for context and were not testimonial under the Sixth Amendment.  *See Crawford*, 541 U.S. at 59, n. 9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)) ("The [Confrontation] Clause [] does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

introduce testimony from an expert witness, Carl Lewis, on CSAAS.  Prior to Mr. Lewis's testimony, the trial judge instructed the jury that the testimony from Mr. Lewis could only be used for assessing the victim's credibility and not to prove whether or not Mr. Noble committed the charges against him.  Mr. Noble maintains that the trial court erred by (1) permitting the CSAAS evidence because the expert was not qualified and (2) failing to require the prosecution to limit Mr. Lewis's testimony to the theories of CSAAS.  Pet. at 65.

On direct appeal, the Court of Appeal expressly rejected both of Mr. Noble's arguments.  It found that "[t]he necessity for this type of evidence arises when the victim's credibility is attacked by a defendant's suggestion that the victim's conduct after the incident, *e.g.*, a delay in reporting, is inconsistent with his or her testimony claiming molestation" and that "the [California] Supreme Court has acknowledged that this type of evidence is admissible for this purpose."  *Noble*, 2004 WL 248984, at *6 (citing *People v. Gilbert*, 5 Cal. App. 4th 1372, 1383 (1992); *People v. Humphrey*, 13 Cal. 4th 1073, 1088 (1996)).  At trial, the victim testified that he did not immediately report the sexual abuse because he was "ashamed and afraid," which resulted in him initially denying the molestation by Mr. Noble in an interview.  *Id*. at 7.  Because of this, Mr. Noble challenged the victim's credibility on cross-examination.  *Id*.  Such credibility challenge opened the door to the use of CSAAS evidence, which Mr. Noble conceded.  *Id*. ("[Mr. Noble] concedes that CSAAS evidence 'may have been admissible' for the limited purpose of explaining [the victim's] "delayed disclosure of the molestations.").  The trial court instructed the jury regarding the permissible use of CSAAS testimony.  *Id*.

The Court of Appeal rejected the argument that the trial court's failure to tailor the CSAAS evidence to exclude certain allegedly inflammatory information—*e.g.*, grooming, retraction, and that there is a greater likelihood that a minor would be molested by someone with whom he or she had a relationship—because it was harmless error.  *Id*.  Regarding Mr. Noble's argument as to Mr. Lewis's qualifications, the Court of Appeal held there were no misrepresentations about his qualifications, and that any argument about credentials goes towards the weight of the testimony, rather than its admissibility.  *Id*. at 9.  Thus, the Court of Appeal concluded that the trial court did not abuse its discretion on both arguments.  *Id*.

United States District Court
Northern District of California

1    Mr. Noble reasserts these two claims before this Court in his current habeas petition.

2 Respondent contends that habeas review precludes a determination on whether the trial judge

3 abused his or her discretion under state law.  Answer at 22–23.  Moreover, Respondent argues that

4 *Brodit v. Cambra*, 350 F.3d 985 (9th Cir. 2003) forecloses Mr. Noble's argument that admission

5 of CSAAS evidence violates due process.  *Id*. at 23.  Lastly, Respondent submits that any error

6 was not prejudicial.

7    With regard to the admissibility of Mr. Lewis's testimony, in *Estelle v. McGuire*, the

8 Supreme Court held that a federal court's habeas review of a state conviction generally does not

9 inquire into the admission of evidence under state evidentiary law.  *Estelle v. McGuire*, 502 U.S.

10 62, 67 (1991).  Specifically, the Court "reemphasize[d] that it is not the province of a federal

11 habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas

12 review, a federal court is limited to deciding whether a conviction violated the Constitution, laws,

13 or treaties of the United States."  *Id*. at 68.  Accordingly, this Court finds that it is precluded from

14 reviewing the proper or improper admission of CSAAS evidence under California law.  The only

15 review this Court can conduct is whether such admission was unconstitutional.

16    In 2003, the Ninth Circuit expressly held that there was no clearly-established Supreme

17 Court precedent that spoke to the constitutionality of CSAAS evidence.  *Brodit*, 350 F.3d at 991.

18 Following *Brodit*, Mr. Noble has not cited, and this Court has not found, any Supreme Court

19 authority concluding that admitting such evidence violates due process.  Mr. Noble attempts to

20 distinguish *Brodit* by arguing that its holding was simply a rejection of a broad categorical

21 challenge to the admissibility of CSAAS testimony, which, according to him, does not foreclose

22 his narrowly-tailored arguments about Mr. Lewis's lack of qualifications and the scope of such

23 testimony.  Traverse at 38.  But *Brodit* noted the heightened standard for relief that generally

24 governs the circumstances presented here—where there is no clearly established federal law or

25 Supreme Court precedent that speaks to the unconstitutionality of CSAAS evidence—even when

26 the scope of that evidence is arguably unnecessarily expansive or where the qualifications of the

27 expert is in question.  *See Brodit*, 350 F.3d at 991.  Indeed, the Supreme Court has made "very few

28 rulings regarding the admission of evidence as a violation of due process."  *Holley v. Yarborough*,

568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Williams v. Taylor,* 529 U.S. 362, 375 (2000)).  "[I]t has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Id.*

The state court's denial of this claim—*i.e.*, that the admission CSAAS testimony violated Mr. Noble's federal constitutional right—was not objectively unreasonably in light of clearly established federal law or Supreme Court precedent.

### 3.    *Brady* Violation (Claim Seven)

As discussed above, Mr. Noble's *Brady* claim alleges that the prosecution failed to produce the original, unedited copy of the recorded telephone call between Mr. Noble and Ms. Richard. He maintains that the full recording contained exculpatory evidence.  Pet. at 72.  In response, Respondent contends that Mr. Noble is speculating that there was a suppressed recording.  Answer at 25.  This claim relies exclusively on two exhibits submitted in support of Mr. Noble's habeas petition.  First, Mr. Noble relies on a post-conviction letter from his trial counsel, in which she states that "I do not think I ever had the original pre-text call tape.  I did however have an expert (Gene Phillips) enhance the tape so we could hear as much as possible from it.  The District Attorney agreed to our version of the tape and the transcript that was provided to the jury reflected our version."  Pet., Ex. H.  The second is Mr. Noble's declaration wherein he avers that the call should have been a three-way conversation between him, his wife, and Ms. Richard, and he "believe[s] that [his] statement of, 'I don't know what you are talking about," among others were edited to be inaudible or deleted."  *Id.*, Ex. D.

There are three elements for demonstrating a *Brady* violation:  (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; (3) and prejudice must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  If accepted as true, Mr. Noble's claim that he denied knowing about the molestation during the pretext call would satisfy the first prong because it is exculpatory evidence.  However, Mr. Noble's self-serving statement is corroborated by nothing else.  Although his attorney may not have obtained a tape marked as "original," his own expert enhanced it so they could listen to it.  Nothing suggests

United States District Court
Northern District of California

1  he or his attorney suspected anything was omitted or altered.  As to the second prong, the superior

2  court refused to accept Mr. Noble's self-serving declaration that the evidence was suppressed

3  because it was not corroborated by anything else in the record.  Docket No. 16-5 (superior court

4  order) at 2.  Again, there is no substantial evidence that demonstrates—expressly or impliedly—

5  that the telephonic recording played to the jury was edited in a nefarious way to remove

6  exculpatory evidence.  "[T]o state a *Brady* claim, [a petitioner] is required to do more than 'merely

7  speculate' about what [non-testifying declarant] told prosecutors."  *See Runningeagle v. Ryan*, 686

8  F.3d 758, 769 (9th Cir. 2012).  The state court did not clearly err under AEDPA.

9      Nor will this Court hold an evidentiary hearing on this proffer alone.  *See Phillips v.*

10 *Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (because there was "absolutely no evidence"

11 demonstrating that a report contained exculpatory evidence, "[t]he district court did not err in

12 characterizing [the petitioner's] *Brady* claims as 'mere suppositions,' and [petitioner] is not

13 entitled to a hearing to pursue them further.").

14      4.    Ineffective Assistance of Trial Counsel (Claim Nine)

15      Mr. Noble contends that his attorney, Mary Steel, rendered ineffective assistance at trial for

16 numerous reasons:  (1) failure to investigate and impeach Ms. Richard; (2) failure to investigate

17 the pretext phone call; (3) failure to obtain the victim's school records to impeach his credibility;

18 (4) failure to obtain Mr. Noble's telephone records, which demonstrated that the victim had lunch

19 with him after the molestation; (5) failure to cross-examine the victim regarding alleged

20 inconsistent statements; (6) failure to call a rebuttal expert witness to the CSAAS expert; (7)

21 failure to move for mistrial regarding the victim's alleged perjury; (8) failure to investigate and

22 present evidence regarding the alleged physical impossibility of the molestation; (9) failure to file

23 a motion on police misconduct; and (10) failure to file a motion to dismiss the charges based on

24 the prosecution's use of alleged perjured testimony.

25      Under *Strickland v. Washington*, 466 U.S. 668 (1984), there is ineffective assistance of

26 counsel where (1) counsel's performance was deficient and (2) that deficient performance

27 prejudiced the defense.  "To establish deficient performance, a person challenging a conviction

28 must show that 'counsel's representation fell below an objective standard of reasonableness.'"

*Harrington v. Richter*, 562 U.S. 86, 104 (2011).  "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Id.*  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Id.* (quoting *Strickland*, 466 U.S. at 687).

On habeas review, however, a court does not conduct a direct *Strickland* inquiry; rather, it is limited to the question of whether the state court's application of the *Strickland* standard was unreasonable.  *See Richter*, 562 U.S. at 101.  As the Supreme Court has underscored, because

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105.

The state court found that Mr. Noble "has not provided any evidence aside from his own opinion to support his allegations of misconduct or ineffective assistance."  *Id.*  Although the state court did not go into an independent analysis as to each ground on which Mr. Noble claims ineffective assistance of counsel, its rejection of Mr. Noble's ineffective assistance claim was not objectively unreasonable under AEDPA.

The decision to not investigate or impeach Ms. Richard was arguably not error because she was not a testifying witness.  Moreover, as discussed above, nothing from the record alludes to an unedited pretext phone call, so Mr. Noble's attorney had no reason to investigate something that she did not think existed.  In fact, his attorney hired an expert to enhance the tape, and there is no indication that the expert opined or suspected that it was not the original recording.  *See* Pet., Ex. H.  To the extent that Mr. Noble contends that an investigation into the victim's school records would have revealed that the victim testified to a different timeframe of the molestation, it is not clear whether this would have produced meaningful inconsistent testimony or would have carried

1    any real impeachment value.  *See People v. Jones*, 51 Cal. 3d 294, 316, (1990), *as modified* (Aug.

2    15, 1990) ("the victim must be able to describe the general time period in which these acts

3    occurred (*e.g.*, 'the summer before my fourth grade,' or 'during each Sunday morning after he

4    came to live with us'), to assure the acts were committed within the applicable limitation period.

5    Additional details regarding the time, place or circumstance of the various assaults may assist in

6    assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a

7    conviction.); *Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not

8    just conceivable.").  Here, the victim described at trial the multiple incidents of sexual molestation

9    with sufficient detail and a general timeframe.  *See* RT 91–118.

10          Nor is this Court persuaded that the additional impeachment evidence of Mr. Noble's

11   telephone records (which allegedly indicated he had lunch with the victim after the last incident of

12   molestation, despite the victim denying ever seeing Mr. Noble again) would have rendered a

13   different result.  Mr. Noble's attorney had ample opportunity to cross-examine the victim—and

14   she took advantage of that opportunity by underscoring other inconsistent statements.  *See* RT

15   133–56.  The added benefit of demonstrating another inconsistent statement regarding not seeing

16   Mr. Noble again after the last incident would not have created a substantial likelihood of a

17   different result.  *See Matylinsky v. Budge*, 577 F.3d 1083, 1093 (9th Cir. 2009) (failure to obtain

18   additional impeachment "would not have changed the outcome of the trial because [the witness's]

19   credibility was already squarely before the jury"); *see also Davis v. Woodford*, 384 F.3d 628, 641–

20   42 (9th Cir. 2003) (failure to impeach with a prior conviction was not prejudicial because the

21   witness's credibility was impeached in other ways).  Nor is there substantial evidence that Mr.

22   Nobel's representation was deficient based on additional ways in which his attorney ***could*** have

23   cross-examined the victim—but did not.  *See Mancuso v. Olivarez*, 292 F.3d 939, 955 (9th Cir.

24   2002) ("[Petitioner's] suggestions regarding how defense counsel might have handled [the

25   witness's] cross examination differently are insufficient to support an ineffective assistance of

26   counsel claim"); *see also Brown v. Uttecht*, 530 F.3d 1031, 1036 (9th Cir. 2008), citing *Dows v.*

27   *Wood*, 211 F.3d 480, 487 (9th Cir. 2000) ("We give 'great deference' to 'counsel's decisions at

28   trial, such as refraining from cross-examining a particular witness'").  In short, the state court

1    could reasonably have determined there was no ineffective assistance claim, or if there was, there

2    was no prejudice under *Strickland*.

3          To be sure, Mr. Noble cites a Second Circuit decision that found the failure to call a

4    rebuttal CSAAS witness constituted deficient representation.  *Gersten v. Senkowski*, 426 F.3d 588,

5    611 (2d Cir. 2005).  There, the court observed,

6          even a minimal amount of investigation into the purported "Child
      Sexual Abuse Accommodation Syndrome" would have revealed that
7          it lacked any scientific validity for the purpose for which the
      prosecution utilized it:  as a generalized explanation of children's
8          reactions to sexual abuse, including delayed disclosure and blurred
      memory.  Similarly, it would appear that had counsel investigated
9          the possibility of challenging the prosecution's psychological expert,
      he would have discovered that exceptionally qualified experts could
10         be found who would challenge the scientific validity of the
      prosecution expert's other theories about, for example, adolescence
11         prompting disclosure of sexual abuse.

12   *Id.*  But Mr. Noble does not offer what a rebuttal expert could have testified to with regard to

13   CSAAS.  *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) ("Wildman offered no

14   evidence that an arson expert would have testified on his behalf at trial.  He merely speculates that

15   such an expert could be found.").  Mr. Noble argues that he was unable to make an expert-witness

16   proffer to the state court because he represented himself *pro se* throughout the state habeas

17   process.  Traverse at 43.  This may be so, but "*Strickland* does not . . . require[] for every

18   prosecution expert an equal and opposite expert from the defense . . . . [because] [i]n many

19   instances cross-examination will be sufficient to expose defects in an expert's presentation."

20   *Richter*, 562 U.S. at 111.  Indeed, here, Mr. Noble's trial attorney had more than one opportunity

21   to cross-examine Mr. Lewis.  *See* RT 181–85, 196–200.  This was not a situation like *Gersten*

22   where the defense attorney "was unable to mount an effective cross-examination, and missed an

23   opportunity to rebut this attempt at bolstering the alleged victim's credibility."  *Gersten*, 426 F.3d

24   at 611.  By contrast, Mr. Noble's attorney challenged Mr. Lewis's qualifications at the pretrial

25   hearing, as well as at trial.  In any event, the state court could reasonably have found no ineffective

26   assistance or prejudice under *Strickland*.

27         Mr. Noble alleges that his trial attorney failed to move for a mistrial when the victim

28   allegedly provided inconsistent statements about whether one incident of molestation occurred in

United States District Court
Northern District of California

21

United States District Court
Northern District of California

September.  Pet at 98–100.  The Court is not persuaded that this single inconsistent statement would clearly have warranted a mistrial.  Nor is Mr. Noble's argument persuasive that his lawyer should have moved to dismiss based on alleged perjury from the prosecution's witnesses—*e.g.*, there were inconsistencies between the victim's testimony and Detective Randol's testimony— because this was a credibility determination for the jury to decide.  Therefore, the failure to move for a mistrial or dismissal was not deficient representation.  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance.").  At least, the state court could reasonably have so found.  Mr. Noble is also not entitled to habeas relief based upon his lawyer's failure to present a physical-impossibility defense with regard to oral copulation and sodomy; this is so because the jury did not convict him on sodomy charges.  Additionally, his lawyer did, in fact, present an impossibility defense during closing argument.  *See* RT 273–74.  As such, there was no prejudice, and it would not have been unreasonable for the state court to have so concluded.

Finally, the Court is unable to review Mr. Noble's claim that "[t]rial counsel failed to file a motion to have conviction dismissed on police misconduct."  Pet. at 102.  The *pro se* petition does not provide any further background, and Mr. Noble's current habeas counsel does not expand on it further in any subsequent filings.  Such a conclusory claim cannot warrant habeas relief.  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

In sum, neither of Mr. Noble's claims have demonstrated that he is entitled to habeas relief for ineffective assistance of counsel under *Strickland*.

### 5.    Improper Amendment of Indictment (Claim Eleven)

Before trial, the judge granted, over Mr. Noble's objection, the prosecutor's request to amend the charging document pursuant to California Penal Code section 1009[11] from the initial time period of January 1, 2002 to May 31, 2002, to the amended time period of June 1, 2001 to

---

[11] Under California Penal Code section 1009, a trial court may permit an amendment to the information at any stage of the proceedings provided that (1) the amendment does not prejudice the substantial rights of the defendant, and (2) it does not charge an offense not shown by the evidence taken at the preliminary hearing.  *See People v. Pitts*, 223 Cal. App. 3d 606, 905 (1990).

1    May 31, 2002.  1 RT 24–31.  Prior to granting the amendment, the trial judge asked defense

2    counsel if she wanted more time to investigate the case because of the additional six-month time

3    frame.  *Id.* at 29–30  She declined.  *Id.* ("I would not be requesting further time to do further

4    investigation.  However, my objection strongly remains.").

5          Mr. Noble contends that the six-month expansion resulted in a materially different time

6    frame than alleged in the initial information or the preliminary hearing.  Supp. Pet. at 16.  He

7    argues that the amendment misled him in making his defense.  *Id.*  Specifically, he represents that

8    his defense to the original charging document was akin to an alibi or lack-of-opportunity defense.

9    *Id.* at 17.  This is so, according to Mr. Noble, because he and his wife moved out of the Camden

10   Street apartment (which is where the molestations occurred) in March 2002, and the victim's

11   bedroom that was the site at which the molestations took place ceased being a bedroom in

12   December 2001.  *Id.* at 17.

13         "No principle of procedural due process is more clearly established than that notice of the

14   specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired,

15   are among the constitutional rights of every accused in a criminal proceeding in all courts, state or

16   federal."  *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948).  "[F]or purposes of AEDPA's 'clearly

17   established Federal law' requirement, it is 'clearly established' that a criminal defendant has a

18   right, guaranteed by the Sixth Amendment and applied against the states through the Fourteenth

19   Amendment, to be informed of any charges against him, and that a charging document, such as an

20   information, is the means by which such notice is provided."  *Gautt v. Lewis*, 489 F.3d 993, 1004

21   (9th Cir. 2007).  "To satisfy this constitutional guarantee, the charging document need not contain

22   a citation to the specific statute at issue; the substance of the information, however, must in some

23   appreciable way apprise the defendant of the charges against him so that he may prepare a defense

24   accordingly."  *Id.*

25         Here, however, the amendment did not materially change the substance of the information

26   embodied in the charged conduct.  The amendment did change the time period during which the

27   charged conduct occurred, but Mr. Noble had adequate notice that the time period of the charged

28   conduct could have included a period before January 2002.  At the preliminary hearing, Officer

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1   Heather McLaughlin testified about her interview with the victim.  ACT 51–58.  The victim also

2   testified at the preliminary hearing at least seven times about the sexual molestation that occurred

3   between the summer and beginning of the school year while he was playing football.  ACT at 8,

4   11, 18, 19, 22, 27, 42–43.  The victim reported the molestations to the police in June 2002, so the

5   clear and obvious inference is that the molestations happened the prior summer (*i.e.*, June 2001).

6   Furthermore, in the police report, Ms. Richard indicated the molestation occurred "[s]ometime

7   between July of 2001 to May 2002," and this report was provided to Mr. Noble during the

8   preliminary hearing.  Docket No. 16-4 (police report).  Accordingly, Mr. Noble had adequate

9   notice of allegations of misconduct beginning as early as summer 2001.  The lack of surprise is

10   confirmed by his attorney's decision to move forward with trial despite the trial judge's offer for a

11   continuance in light of the amendment.  At least, the state court could reasonably have found the

12   amendment, under the circumstances of the case, did not violate clearly established law.

13         6.   <u>Ineffective Assistance of Appellate Counsel (Claim Twelve)</u>

14         This claim is related to Mr. Noble's timeframe-variance claim.  He argues that his

15   appellate counsel, Steven Schorr, rendered ineffective assistance because he failed to raise a

16   jurisdictional and due process argument related to the indictment's amendment.  Supp. Pet. at 9.

17   An ineffective assistance of appellate counsel claim is governed by the two-part test articulated in

18   *Strickland*.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S.

19   527, 535–36 (1986)); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

20         For the reasons stated above, this Court finds that Mr. Schorr's election to not pursue the

21   variance claim on direct appeal was not objectively unreasonable.  *Rhoades v. Henry*, 596 F.3d

22   1170, 1179 (9th Cir. 2010) (holding counsel did not render ineffective assistance in failing to

23   investigate or raise an argument on appeal where "neither would have gone anywhere"); *Wildman*

24   *v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on

25   direct appeal does not constitute ineffective assistance when appeal would not have provided

26   grounds for reversal"); *Smith v Stewart*, 140 F.3d 1263, 1274 n. 4 (9th Cir. 1998) (counsel has no

27   obligation to file "kitchen-sink briefs" on appeal).  Additionally, Mr. Noble's trial counsel only

28   objected to the amendment on jurisdictional grounds—not on due process grounds—so the failure

to raise the due process argument on appeal was not unreasonable because it was waived.  *See* Cal. Evid. Code, § 353.

There is no basis under AEDPA to grant habeas relief on this claim.

### 7.   Cumulative Error (Claim Ten)

As demonstrated by the foregoing, no constitutional error occurred.  Therefore, this cumulative-error claim must fail.  *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation").

## V.   **CONCLUSION**

Mr. Noble's petition for writ of habeas corpus is **DENIED**.  A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This order disposes of Docket Nos. 1, 66, 94, 95.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: July 15, 2020

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

25